**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

Carmen de Lourdes Cáez,

Plaintiff,

v.

Universidad de Puerto Rico, et al.,

Defendants.

**Civil No. 20-01003(GMM)**

<u>**OPINION AND ORDER**</u>

Before the Court is Defendant University of Puerto Rico's ("UPR or Defendant") *Motion for Summary Judgment* and *Statement of Uncontested Facts*. (Docket Nos. 64 and 65). The Court grants UPR's *Motion for Summary Judgment*. Judgment of dismissal with prejudice shall be entered accordingly.

**I. PROCEDURAL BACKGROUND**

On January 9, 2020, Carmen de Lourdes Cáez-Rodríguez ("Plaintiff") sued UPR; Professor Luis A. Lugo-Amador ("Lugo"); Professor Harry A. Hernández-Tirado, former Department of Humanities Director ("former Humanities Director Hernández"); Professor Raúl J. Castro, former Dean of Academic Affairs ("Dean of Academic Affairs Castro"); Professor Walter Mucher-Serra, Humanities Director from 2017 - May 2022 ("Humanities Director Mucher"); Glorivee Rosario, former Interim Rector ("Interim Rector Rosario"); and Professor Irmanette Torres, former Interim Dean ("Interim Dean Torres"). (Docket No. 1).

She claims violations under 42 U.S.C. § 1983 ("Section 1983")
pursuant to the First and Fourteenth Amendments of the U.S.
Constitution, U.S. Const. amends. I, XIV; retaliation under Title
VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §
2000e-3(a); gender discrimination under Puerto Rico Act 100 of
June 30, 1959, P.R. Laws Ann. tit. 29, § 146 et seq. ("Act 100");
sexual harassment under Puerto Rico Act 17 of April 22, 1988, P.R.
Laws Ann. tit. 29 §§ 155 et seq. ("Act 17"); and retaliation under
Puerto Rico Act 115 of December 20, 1991, P.R. Laws Ann. tit. 29,
§ 194 et seq. ("Act 115").

On June 8, 2020, the Court entered a Partial Judgment. It
dismissed, <u>with prejudice</u>, all claims against Defendants Lugo,
former Humanities Director Hernández, Dean of Academic Affairs
Castro, and their respective spouses and conjugal partnerships.
(Docket Nos. 47 and 48).

On March 4, 2021, the Court entered a second Partial Judgment.
It dismissed, <u>with prejudice</u>, all claims against Defendants
Interim Rector Rosario, Interim Dean Torres and Humanities
Director Mucher, and their respective spouses and conjugal
partnerships. (Docket Nos. 52 and 53).

The only surviving claim, and the only one that is subject to
this Opinion and Order, is a retaliation allegation against UPR
stemming from Plaintiff's reporting of the sexual harassment
incident with Lugo at UPR and before the "Puerto Rico Department

of Labor-Antidiscrimination Unit" and the Equal Employment Opportunity Commission ("EEOC").

On February 28, 2023, the remaining Defendant —UPR— filed a *Motion for Summary Judgment* and *Statement of Uncontested Facts in Support of Motion for Summary Judgment.* It requested dismissal of all claims. (Docket Nos. 64 and 65). Plaintiff sought, and the Court granted, two extensions of time to respond to UPR's *Motion for Summary Judgment*. (Docket Nos. 70 and 74). On April 17, 2023, she opposed UPR's *Motion for Summary Judgment*. (Docket No. 77).

On April 18, 2018, Plaintiff filed an *Opposition to Defendant's Statement of Uncontested Material Facts in Support of Motion for Summary Judgment*. (Docket No. 79). On June 6, 2023, UPR filed its *Reply to Plaintiff's Opposition to the Defendant's Statement of Uncontested Material Facts in Support of Motion for Summary Judgment* and its *Reply to Opposition to Motion for Summary Judgment*. (Docket Nos. 103 and 104).

## II.   SUMMARY JUDGMENT STANDARD

Fed. R. Civ. P. 56

Fed. R. Civ. P. 56 governs motions for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute in a material fact "if the evidence 'is such that a reasonable jury could resolve the point in favor of

the non-moving party.'" Taite v. Bridgewater State University, Board of Trustees, 999 F.3d 86, 93 (1st Cir. 2021) (*quoting* Ellis v. Fidelity Management Trust Company, 883 F.3d 1, 7 (1st Cir. 2018)). In turn, a fact is material "if it 'has the potential of affecting the outcome of the case.'" Id. (*quoting* Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)). In making its determination, the Court will look to "the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits. . ." Johnson v. University of Puerto Rico, 714 F.3d 48, 52 (1st Cir. 2013) (*citing* Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008)).

The movant has "the initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact' with definite and competent evidence." Arroyo-Ruiz v. Triple-S Management Group, 258 F.Supp.3d 240, 245 (D.P.R. 2017) (*quoting* Campos v. Van Ness, 711 F.3d 243, 247-48 (1st Cir. 2013)). "Once the moving party has properly supported [its] motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which [it] has the burden of proof, to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (*quoting* DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)). Indeed, the non-movant is required to "present definite, competent evidence to rebut the motion." Martínez-Rodríguez v. Guevara, 597

F.3d 414, 419 (1st Cir. 2010) (*quoting* Vineberg v. Bissonnette,
548 F.3d 50, 56 (1st Cir. 2008)).

Further, the Court must "draw [] all reasonable inferences in
favor of the non-moving party while ignoring conclusory
allegations, improbable inferences, and unsupported speculation."
Smith v. Jenkins, 732 F.3d 51, 76 (1st Cir. 2013). The Court must
also refrain from engaging in assessing the credibility or weight
of the evidence presented. *See* Reeves v. Sanderson Plumbing
Products, Inc., 530 U.S. 133, 135 (2000) ("Credibility
determinations, the weighing of the evidence, and the drawing of
legitimate inferences from the facts are jury functions, not those
of a judge."). Facts which are properly supported "shall be deemed
admitted unless properly controverted" and the Court is free to
ignore such facts that are not properly supported. Local Civ. R.
56(e); Rodríguez-Severino v. UTC Aerospace Sys., No. 20-1901, 2022
WL 15234457, at *5 (1st Cir. Oct. 27, 2022).

In addition, hearsay is an out-of-court statement offered
into evidence to prove the truth of the matter asserted in the
statement. *See* Fed. R. Evid. 801(c). "It is black-letter law that
hearsay evidence cannot be considered on summary judgment." Dávila
v. Corporación de P.R. para la Difusión Publica, 498 F.3d 9, 17
(1st Cir. 2007). Typically, unsworn witness statements that are
not made under penalty of perjury are inadmissible for purposes of
summary judgment. *See* e.g., Tomasini v. United States Postal Serv.,

Civil No. 20-01003(GMM)
Page -6-

594 F. Supp. 3d 355, 374 (D.P.R. 2022); Setterlund v. Potter, 597 F. Supp. 2d 167, 172 (D. Mass. 2008).

Also, "[i]n collecting a record for summary judgment a district court must sift out non-English materials, and parties should submit only English-language materials." Estades-Negroni v. Assocs. Corp. of N. Am., 359 F.3d 1, 2 (1st Cir. 2004) *citing* United States v. Rivera-Rosario, 300 F.3d 1, 6 (1st Cir. 2002).

Local Civ. R. 56

Local Civ. R. 56 also controls motions for summary judgment. *See* Local Civ. R. 56. In sum, it requires from the non-movant to "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Local Civ. R. 56(c). If the fact is not admitted, "the opposing statement shall support each denial or qualification by a record citation. . ." Id. In its opposing statement, the non-movant can include additional facts supported by record citations. *See* Id. In turn, the movant "shall submit with its reply a separate, short, and concise statement of material facts, which shall be limited to any additional fact submitted by the opposing party." Local Civ. R. 56(d). In its statement, the movant shall admit, deny, or qualify those additional facts. *See* Id. Any denial and qualification that the movant raises must be supported by a record citation. *See* Id.

Civil No. 20-01003(GMM)
Page -7-

Failure to comply with Local Rule 56(c) gives the Court the ability to accept a party's proposed facts as stated. *See* López-Hernández v. Terumo Puerto Rico LLC, 64 F.4th 22, 26 (1st Cir. 2023); *see also* Natal Pérez v. Oriental Bank & Trust, 291 F.Supp.3d 215, 219 (D.P.R. 2018) ("If a party improperly controverts the facts, Local Rule 56 allows the Court to treat the opposing party's facts as uncontroverted."). Litigants ignore Local Rule 56(c) at their peril. *See* López-Hernández, 64 F.4th at 26.

### III. FINDINGS OF FACT

The Court examined Defendant's *Statement of Uncontested Facts in Support of Motion for Summary Judgment* (Docket No. 65) and Plaintiff's *Opposition to Defendant's Statement of Uncontested Material Facts in Support of Motion for Summary Judgment*. (Docket No. 79). First, the Court only credits material facts properly supported by a record citation. Second, the Court does not consider videos from appearances before the Puerto Rico Senate public hearings as they: (a) are unsworn statements not made under penalty of perjury; (b) were submitted in Spanish; and (c) the Court considers them inadmissible hearsay. *See* Fed. R. Evid. 801(c); Dávila v. Corporación de P.R. para la Difusión Pública, *supra*; Tomasini v. United States Postal Serv., *supra*; Estades-Negroni v. Assocs. Corp. of N. Am., *supra*.

Civil No. 20-01003(GMM)
Page -8-

Accordingly, the Court makes the following findings of fact which concentrate on the retaliation cause of action: Plaintiff's retaliation claim under Title VII.[1]

1.  An academic year at UPR consists of two semesters: (i) August to December; and (ii) January to May. (Docket Nos. 71, Exhibit 2 ¶ 6, and 79 at 6 ¶ 11).

2.  UPR issued its first fixed term teaching services agreement with Plaintiff in January 2001. (Docket No. 71, Exhibit 1 at 3).

3.  Per the partial fixed term teaching services agreement, Plaintiff would teach two humanities courses in the Extended University Program ("UNEX"), for the January 2001-May 2001 semester. (Docket Nos. 71, Exhibit 1 at 3-4, and 79 at 2 ¶ 1).

4.  A partial fixed term teaching services agreement consists of UPR's assignment of one to three regular courses per semester, without exceeding nine contract hours. (Docket Nos. 71 at 8, and 79 at 6).

5.  During the contractual relationship between the Parties, they issued fixed term teaching services agreements for both, partial and full workloads as follows.

---

[1] UPR offers a series of uncontested facts and supporting documentation in support of their alleged legitimate/non-retaliatory basis for lack of renewal of Plaintiff's teaching services agreement for the 2018-2019 academic year. UPR's proposal address its dire financial situation due to budget cuts, a reduction in new student enrollment, the effects and aftermath of hurricanes Irma and María, the Personnel Committee's process of compiling candidates for available teaching offerings, tabulation criteria, inclusion of candidates in the Register of Eligible Candidates, the Committee's decision-making process, among others. However, to the extent Plaintiff could not establish a prima facie case showing of retaliation, under Title VII, the burden does not shift to UPR to articulate legitimate, non-retaliatory explanations for its actions and subsequent steps. Accordingly, the Court does not address them. *See Statement of Uncontested Facts in Support of Motion for Summary Judgment* (Docket No. 65) and *Opposition to Defendant's Statement of Uncontested Material Facts in Support of Motion for Summary Judgment*. (Docket No. 79).

Civil No. 20-01003(GMM)
Page -9-

| Partial Workload |
|:---:|
| 2001-2003 |
| 2003-2004 |
| 2008-2009 |
| 2009-2010 |
| 2010-2011 |
| 2011-2012 |
| 2021-2022 |
| **Full Workload** |
| 2004-2005 |
| 2006-2007 |
| 2007-2008 |
| 2012-2013 |
| 2013-2014 |
| 2015-2016 |
| 2016-2017 |
| 2017-2018 |
| 2019-2020 |
| 2020-2021 |

(Docket No. 71, Exhibit 1 at 4-8 and 79 at 2 ¶ 4).

6.  Plaintiff had fixed term teaching services agreements with UPR to teach courses in: Humanities, History of Puerto Rico, History of the United States of America, Cinema and History, Literature and History, Hispanic American history, and courses in the general education component known as interdisciplinary courses. (Docket Nos. 71, Exhibit 1 at 8, and 79 at 3 ¶ 6.)

7.  The "Contract for Services Appointed of Teaching Personnel" ("Teaching Services Agreement"), at its paragraph G, states:

> G. Should the funds used to pay for the services under this contract come from external sources or are nonrecurrent funds for any reason, the validity of this contract is subject to the sufficiency or availability of said funds. Should there not be sufficient funds to pay for the services, the contract may be terminated by THE FIRST PARTY, notifying THE SECOND PARTY of said situation in writing.

(Docket Nos. 71, Exhibit 3 at 4, and 79 at 3 ¶ 5).

8.    The Teaching Services Agreement, at its paragraph J, states:

> J. This contract or appointment <u>does not imply or create any expectation that it shall be renewed or extended beyond the expiration date established within it</u>. It also does not create an expectation of being appointed to a regular position in its broadest sense. When the University has the need to fill a vacant position, the recruitment process shall be carried out in accordance with current regulations. (Emphasis added).

(Docket Nos. 71, Exhibit 3 at 4, and 79 at 3 ¶ 5).

9.    The Teaching Services Agreement, at its paragraph L, states:

> CLAUSE REGARDING CANCELLATION OR TERMINATION
> Any of the parties may terminate this contract or appointment through a written notification provided thirty (30) days before the termination date, except in the case of academic personnel dedicated to teaching, in which case it may not be terminated while it is in effect, except for extraordinary circumstances.

(Docket Nos. 71, Exhibit 3 at 4).

10.   The *Policies and Procedures for Recruiting Teaching Staff at The University of Puerto Rico Cayey* ("Policies and Procedures") defines a "Person under contract" as "A <u>person who renders services</u> to the University without holding a position <u>under a services contract</u> that assigns some duties and responsibilities for <u>a set period of time</u>." (Docket No. 93, Exhibit 8 at 3). (Emphasis added).

11.   Plaintiff "taught her classes without supervision". Docket No. 77 at 11.

12. Under Plaintiff's fixed term teaching services agreements, UPR paid Plaintiff on a monthly basis. (Docket Nos. 71, Exhibit 3 at 1 and 77 at 11).

13. Under Plaintiff's fixed term teaching services agreements, she did not accrue annual leave with UPR, but accrued sick leave. (Docket Nos. 71, Exhibit 3 at 1 and 77 at 11).

14. Under Plaintiff's fixed term teaching services agreements, Plaintiff did not accumulate retirement benefits with UPR. (Docket No. 77 at 11).

15. Under Plaintiff's fixed term teaching services agreements, UPR did not withhold Social Security from her earnings, nor did it pay the employer's portion for such concept. (Docket No. 77 at 11).

16. On Friday, March 17, 2016, the History Committee met at Lugo's office to review the History program. (Docket Nos. 71, Exhibit 1 at 16, and 79 at 8 ¶ 15)

17. Lugo, former Humanities Director Hernández, and Plaintiff attended the meeting. (Docket Nos. 71, Exhibit 1 at 16-17, and 79 at 8 ¶ 15).

18. Former Humanities Director Hernández left the office for a moment to help a student that arrived to discuss a matter. Plaintiff was sitting next to Lugo reading a document they were reviewing. Lugo held her arms and asked Plaintiff whether he could kiss her. He kissed her on the cheek without her authorization. Lugo then attempted to kiss Plaintiff's lips and she pushed him back. Then Lugo retracted and told her to relax since it was social Friday. (Docket Nos. 71, Exhibit 1 at 17, and 79 at 8 ¶ 16).

19. Upon Former Humanities Director Hernández return, Plaintiff excused herself from the meeting, went to the office of the Humanities Department and told Ms. Carmen Alsina, the Department's secretary ("Department Secretary Alsina"), that Lugo had rushed at her. Department Secretary Alsina asked Plaintiff not to leave and wait for Humanities Director Hernández, but Plaintiff told her she

wanted to leave. (Docket Nos. 71, Exhibit 1 at 18, and 79 at 8 ¶ 17).

20. That same day, Friday, March 17, 2016, former Humanities Director Hernández called Plaintiff by phone at 6:00 pm to ask her what happened. Plaintiff narrated the incident with Lugo. Former Humanities Director Hernández told Plaintiff that he would talk to Lugo the following Monday and request an explanation. Plaintiff and Humanities Director Hernández agreed to meet afterwards. (Docket Nos. 71, Exhibit 1 at 19, 21, and 79 at 8-9 ¶ 18).

21. Former Humanities Director Hernández asked Plaintiff to prepare a letter narrating the incident with Lugo. Plaintiff proceeded accordingly and addressed a letter the to him, which she dated April 4, 2016. Plaintiff delivered the letter the next day, on April 5, 2016. (Docket Nos. 71, Exhibit 1 at 22, and 79 at 9 ¶ 20).

22. The Personnel Committee of the Humanities Department of the UPR Cayey Campus ("Personnel Committee") is comprised of three tenured professors selected by their peers. The Director of the Humanities Department presides over the Personnel Committee and serves as an *ex officio* member. Only tenured professors may serve in the Personnel Committee. (Docket No. 79 at 5 ¶ 9).

23. In August 2017, the Personnel Committee membership changed. Hernández left his position as Director of the Humanities Department and became a regular member, together with Professor Yadmilla Bauzá-Vargas ("Professor Bauzá") and Professor Carlos R. Casanova-Izaguirre ("Professor Casanova"). (Docket No. 79 at 11 ¶ 27).

24. Professor Mucher, as the newly appointed Director of the Department, began presiding over the Committee. (Docket No. 79 at 11 ¶ 27).

25. On November 20, 2017, Plaintiff shared with her office colleagues, Professor Bauzá and Professor Casanova, the incident with Lugo. The latter reported it to the newly appointed Humanities

Director, Professor Mucher. (Docket Nos. 71,
Exhibit 1 at 43, and 79 at 11-12 ¶ 28).

26. Upon receiving a copy of the April 2016 letter
Plaintiff had submitted to former Humanities
Director Hernández, Professor Mucher —now
Humanities Director— referred the matter to the
Human Resources Office of the UPR Cayey Campus
("HR") on November 27, 2017. (Docket Nos. 71,
Exhibit 1 at 51-52 and Exhibit 4, and 79 at 12 ¶
31).

27. HR requested Plaintiff provide a sworn statement.
(Docket Nos. 1, Exhibit 1 at 53-55, and 79 at 13 ¶
33).

28. On December 18, 2017, as required by HR, Plaintiff
submitted a statement under oath with the contents
she included in the April 2016 letter to former
Humanities Director Fernández. Plaintiff also met
with the HR Director, Enérida Rodríguez ("HR
Director"). (Docket Nos. 71, Exhibit 1 at 55, 72-
73, and 79 at 13 ¶ 34).

29. UPR assigned examiner attorney Sheila Cruz to
investigate Plaintiff's allegations. Plaintiff
provided testimony before the examiner. (Docket
Nos. 71, Exhibit 1 at 56, and 79 at 13 ¶ 35).[2]

30. On August 7, 2018, Humanities Director Mucher
informed Plaintiff, in writing, as follows:

> Unfortunately, after making the
> adjustments ordered by the Academic
> Deanship as a result of budget cuts and
> the decrease in new enrollments, we
> cannot offer you courses in our
> department at this time.
>
> Still, we have submitted your name for
> consideration to the UNEX coordinator.

(Docket No. 71, Exhibit 1 at 74).

---

[2] In 2019, UPR notified Plaintiff of the results of UPR's investigation. (Docket
No. 71, Exhibit 1 at 57; Docket No. 79 at 14 ¶ 39).

31. UPR sent the same letter to four other professors.
(Docket No. 109, Exhibit 2 at 12-16).

32. On August 14, 2018, UPR informed Plaintiff, in
writing, of the availability of a partial workload
fixed term teaching services agreement for two
Humanities courses at UNEX for a total of six
credits.

> I would like to inform you that, for this
> semester, 2018 - [20]19, the UNEX office
> has, as part of your offer, two
> Humanities courses that are available.
>
> [. . .]
>
> Please indicate whether you are
> interest[ed] in taking on these courses.

(Docket No. 71, Exhibit 1 at 75 and Exhibit 2 ¶ 18,
and 79 at 21 ¶ 52).

33. On August 15, 2018, Plaintiff rejected the partial
workload fixed term teaching services agreement for
academic year 2018-2019. She indicated:

> To whom it may concern: I am not
> accepting the classes due to financial
> reasons. I need to find a job to remedy
> the financial situation caused by my
> termination.

(Docket No. 71, Exhibit 2 ¶ 19, and 79 at 22 ¶ 53,
Exhibit 1 ¶ 6).

34. On October 3, 2018, Plaintiff filed a "Charge of
Discrimination" before the Puerto Rico Department
of Labor-Antidiscrimination Unit" and the EEOC. She
claimed as follows:

> In December 2017, I formally filed an
> internal sexual harassment complaint
> with [HR] the Director of Human Resources
> against [Lugo]. In August 2018, [UPR] did
> not renew the contract because of alleged
> budget cuts. I believe that [UPR]

> terminated me (did not renew the
> contract) in retaliation for having filed
> a sexual harassment complaint.

(Docket No. 71, Exhibit 5, and 79 at 14 ¶ 40)
(emphasis added).

35.  The Parties issued a fixed term full workload
     teaching services agreement for academic year 2019-
     2020. (Docket No. 79 at 25 ¶ 61).

36.  The Parties issued a fixed term full-time teaching
     services agreement for academic year 2020-2021.
     (Docket No. 79 at 25 ¶ 61).

37.  The Parties issued a fixed term partial workload
     teaching services agreement for academic year 2021-
     2022. (Docket No. 71, Exhibit 1 at 7, and 79 at 25
     ¶ 62).

## IV.  APPLICABLE LAW AND DISCUSSION

A.  <u>Eleventh Amendment Immunity</u>

As a threshold matter, the Court must first address
Defendant's assertion that UPR is entitled to Eleventh Amendment
immunity.

The Eleventh Amendment to the Constitution of the United
States of America provides: "[t]he Judicial power of the United
States shall not be construed to extend to any suit in law or
equity, commenced or prosecuted against one of the United States
by Citizens of another State, or by Citizens or Subjects of any
Foreign State." U.S. Const. amend. XI. States cannot be sued for
monetary damages in federal court unless the state being sued
waives its Eleventh Amendment immunity or consents to being sued.
<u>O'Neill v. Baker</u>, 210 F.3d 41 (1st Cir. 2000). Puerto Rico has

long been considered a state for Eleventh Amendment purposes. *See Irizarry-Mora v. Univ. of Puerto Rico*, 647 F.3d 9 (1st Cir. 2011); Metcalf & Eddy, Inc. v. P.R. Aqueduct & Sewer Auth., 991 F.2d 935 (1st Cir. 1993); *See also* Cardona Roman v. Univ. of Puerto Rico, 799 F. Supp. 2d 120, 129 (D.P.R. 2011) ("States cannot be sued for monetary damages in federal court unless the state being sued waives its Eleventh Amendment immunity or consents to being sued.").

The First Circuit and this District have consistently held that the UPR is an "arm" of the Commonwealth that is entitled to Eleventh Amendment immunity. Irizarry-Mora, 647 F.3d at 14; Cardona Roman, 799 F. Supp. 2d at 130; Montalvo-Padilla v. Univ. of P.R., 492 F. Supp. 2d 36, 43 (D.P.R.), on reconsideration, 498 F. Supp. 2d 464 (D.P.R. 2007) ("The First Circuit and this District have consistently held that [UPR] is an instrumentality of the state for Eleventh Amendment purposes and, as such, is not amenable to suit in federal court."); *See also* 13 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Richard D. Freer, Federal Practice & Procedure § 3524.2, at 325-32 (2008) (noting that state universities are usually considered arms of the state).

As to claims pursuant to Section 1983, "'neither a state agency nor a state official acting in his official capacity may be sued for damages in a section 1983 action.'" Wang v. N.H. Bd. of Registration in Med., 55 F.3d 698, 700 (1st Cir. 1995) (*citing*,

Johnson v. Rodríguez, 943 F.2d 104, 108 (1st Cir. 1991)). "This
is so because § 1983 did not abrogate an unconsenting state's
Eleventh Amendment immunity from being sued in damages in federal
court." Negrón-Almeda v. Santiago 528 F.3d 15, 19 (1st Cir. 2008)
(*citing* Vicenty-Martell v. Estado Libre Asociado De P.R., 48 F.
Supp.2d 81, 92 (D.P.R. 1999)).

B.    Title VII Claims and Sovereign Immunity

       The Supreme Court of the United States has held that Title
VII claims are not barred by the Eleventh Amendment. Fitzpatrick
v. Bitzer, 427 U.S. 445, 447-448 (1976). Congress in the 1972
Amendments to Title VII, "authorized federal courts to award money
damages in favor of a private individual against a state government
found to have subjected that person to employment discrimination
on the basis of 'race, color, religion, sex, or national origin.'"
Id.

       Title VII's 1972 Amendments enable private individuals to sue
a state government. Accordingly, filings of Title VII claims
against Puerto Rico and its instrumentalities in this District
Court are permitted. Alberti v. Univ. of Puerto Rico, 818 F. Supp.
2d 452, 461 (D.P.R. 2011), aff'd sub nom. Alberti v. Carlo-
Izquierdo, 548 F. App'x 625 (1st Cir. 2013).

C.    Injunctive relief

       As stated before, the Eleventh Amendment generally bars suits
against states and state officials. "However, the exception to

Eleventh Amendment immunity laid out in <u>Ex parte Young</u>, 209 U.S. 123 (1908), allows federal courts to "'grant [ ] prospective injunctive relief to prevent a continuing violation of federal law,' in part because 'a suit challenging the constitutionality of a state official's action in enforcing state law is not one against the State.'" <u>Doe v. Shibinette</u>, 16 F.4th 894, 903 (1st Cir. 2021) (*quoting* <u>Negrón-Almeda v. Santiago</u>, 528 F.3d at 24); *see also* <u>Green v. Mansour</u>, 474 U.S. 64, 68, (1985).

Plaintiff has sought injunctive relief by alleging "[t]he UPR should be enjoined to implement policies and procedures that work to address sexual harassment." (Docket No. 1 at 11 ¶ 93). Yet, she has not met the burden for such relief. Furthermore, Plaintiff has confused the basic concept underlying <u>Ex parte Young</u> and its progeny and forgotten that no state officials remain in this suit. "Plaintiff may seek prospective injunctive relief against a state official, but may not obtain such relief against a state or its agency because of the sovereign immunity bar of the Eleventh Amendment." <u>Poirier v. Mass. Dep't of Corr.</u>, 558 F.3d 92, 97 n.6 (1st Cir. 2009); *see also*, <u>Nieves-Marquez v. Puerto Rico</u>, 353 F.3d 108, 114 n. 1 (1st Cir. 2003) ("Under <u>Ex parte Young</u> the defendant state officers were proper defendants for prospective injunctive relief, but the Commonwealth or the Department qua Department were not.") (internal citation omitted).

Civil No. 20-01003(GMM)
Page -19-

Per the discussion above, the UPR is entitled to Eleventh Amendment immunity. Accordingly, Plaintiff's claims for damages and injunctive relief pursuant to Section 1983 are hereby DISMISSED with prejudice. Since Plaintiff's claim as to Title VII is not barred by Eleventh Amendment immunity, the Court will analyze it later in this Opinion.

D.   Sovereign immunity as to claims under Puerto Rico law

Plaintiff also seeks damages upon supplemental jurisdiction pursuant to 28 U.S.C. § 1367 on state law claims stemming from Act 100, Act 17, and Act 115.

The Commonwealth of Puerto Rico has consented to be sued for damages in actions brought under the general negligence statute of Puerto Rico. However, said consent does not extend to the federal courts. Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 34 (1st Cir. 2006). Regarding the causes of action stemming from Puerto Rico law, the Commonwealth has not waived sovereign immunity. Pagan v. Puerto Rico, 991 F.Supp.2d 343, 347 (D.P.R. 2014).

Furthermore, this District has held, on numerous occasions, that sovereign immunity shields the Commonwealth and its instrumentalities from Act 100, Act 17 and Act 115 claims in federal court. See Lugo-Matos v. P.R. Police Dep't, 2016 WL 742912, at *6 (D.P.R. Feb. 24, 2016); Diaz v. Dep't of Educ., 823 F. Supp. 2d 68, 77 (D.P.R. 2011); Torres-Santiago v. Alcaraz-Emmanuelli, 553 F. Supp. 2d 75, 86 (D.P.R. 2008); Huertas-Gonzalez v. Univ. of

Civil No. 20-01003(GMM)
Page -20-

Puerto Rico, 520 F. Supp. 2d 304, 315-16 (D.P.R. 2007); Vizcarrondo

v. Bd. of Trs. of Univ. of P.R., 139 F.Supp.2d 198, 208 (D.P.R.

2001). Moreover, as to claims pursuant to Law 100, it is settled

that "Law 100 does not apply to non-profit government

instrumentalities as is the U.P.R." Dogson v. University of Puerto

Rico, 26 F.Supp.2d 341, 342 (D.P.R. 1998); *see also* Rivera Torres

v. UPR, 209 D.P.R. 539 (2022) (The Supreme Court of Puerto Rico

recently clarifying that suits cannot be brought against the UPR

pursuant to Act 100).

Consequently, Plaintiff's Puerto Rico law claims stated in

the Fourth, Fifth and Sixth Causes of Action are DISMISSED WITH

PREJUDICE.

E.   The Parties' relationship under Title VII[3]

"Title VII makes it unlawful for 'an employer to discriminate

against any of his employees. . .because [the employee] has opposed

any practice made an unlawful employment practice by [Title VII],

or because he has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or

hearing under [Title VII].'" Planadeball v. Wyndham Vacation

Resorts, Inc., 793 F.3d 169, 175 (1st Cir. 2015) (*citing* 42 U.S.C.

§ 2000e-3(a)).

---

[3] The Court does not incorporate other facts pertaining to Plaintiff's sexual
harassment allegations, UPR's investigation thereof, precautionary measures,
disciplinary action against those involved. It centers on the retaliation claim.

Civil No. 20-01003(GMM)
Page -21-

Title VII's definition of "employee" does not cover independent contractors and therefore, an independent contractor may not maintain a Title VII action against the entity with which she contracts. *See* Alberty-Vélez v. Corporación de Puerto Rico para la Difusión Pública, 361 F.3d 1, 6 (1st Cir. 2004). "[I]t is now clear that [Title VII] does not cover independent contractors. Thus, an independent contractor may not maintain a Title VII action against the entity with which she contracts." Id. (internal citations omitted).

While UPR appears to concede, *sub silentio*, that Plaintiff is an employee entitled to the protection of Title VII and does not address the "common law agency test" applied by the First Circuit to determine whether a plaintiff is an employee or an independent contractor under Title VII, this Court must assess—firstly—the nature of Plaintiff's relationship with UPR. The survival of Plaintiff's Title VII claim depends on it. Under such test, a court must consider:

> the hiring party's right to control the manner and means by which the product is accomplished. Among other factors relevant to this inquiry are the skills required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business;

the provision of employee benefits; and the tax treatment of the hired party.

Id. at 7.

No one factor is decisive and, in most situations, the extent to which the hiring party controls "the manner and means" by which the worker completes her tasks will be the most important factor in the analysis. Id.

A review of these factors favors classifying Plaintiff as an independent contractor.

First, Plaintiff offered services as a university professor, a skilled position requiring specific training and qualifications. Plaintiff possesses a Doctorate degree, specialized preparation, published works, among others. Notably, Plaintiff indicates she offered her teaching services without supervision and accordingly, enjoyed academic freedom, commonly known in Spanish as "libertad de cátedra"; *i.e.*, Plaintiff performed her responsibilities under the teaching services agreements outside UPR's control.

Second, the Parties entered into multiple fixed term teaching services agreements which varied in duration (41% of them were for partial workload and 59% for full workload) and subject matter (course offerings ranged from History of Puerto Rico to Cinema and History to General Studies, among others).

Third, as per UPR's Policies and Procedures, Plaintiff was —at all relevant times— a "person under contract" who rendered

services, under a teaching services agreement, for specific periods of time.

Fourth, the Parties were free to unilaterally terminate the teaching services agreements. So, either party could walk away from the contractual relationship.

Fifth, UPR could assign Plaintiff the number of credits agreed under the fixed term teaching services agreement. Plaintiff could decline UPR's offer to teach some or all course offerings like she did regarding the partial workload offer for the 2018-2019 academic year.

Sixth, the Parties signed the fixed term teaching services agreements voluntarily, freely, and knowingly. Plaintiff acknowledged it did not imply or create any expectation that it shall be renewed or extended beyond the expiration date established within it.

Seventh, Plaintiff is paid monthly.

Eight, UPR did not provide Plaintiff general employee benefits. Plaintiff did not accumulate regular leave (although she received sick leave), nor did she accumulate or receive retirement benefits. In terms of the tax treatment of Plaintiff's earnings via the teaching services agreements, UPR did not withhold Social Security, nor did it pay the employer's portion for such concept.[4]

---

[4] Plaintiff's tax returns are not part of the record. As such, the Court is unaware whether Plaintiff described her income before local and federal fiscal

Despite these factors favoring independent contractor status, Plaintiff argues UPR controlled the manner of her work in that UPR provided the place of work (Cayey Campus). However, in *Alberty-Velez*, this type of control was considered irrelevant to the analysis since a television company could only produce the show by controlling the location of filming. *See Alberty-Velez*, 361 F.3d at 10. Likewise, a university will hold their teaching activities, under ordinary circumstances, at their facilities.

Plaintiff further contends that her over seventeen-year relationship with the UPR favors classifying her as an employee. Yet, First Circuit caselaw does not support her assertion. *See Dykes v. DePuy, Inc.*, 140 F.3d 31, 34-36 (1st Cir. 1998) (The parties' six-year relationship did not alter the Court's conclusion that plaintiff was an independent contractor); *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 627 (1st Cir. 1998) (Plaintiff was an independent contractor despite the parties' twenty-year relationship).

In sum, it is clear to the Court that UPR exercised minimal, if any, control over Plaintiff's daily activities as a professor. Significantly, while engaging in teaching services agreements, Plaintiff could pursue other professional opportunities. That degree of independence undermines her contention that she was an

---

authorities, as deriving from professional services rendered, or whether UPR provided Plaintiff with Form W-2PR or a 480.

Civil No. 20-01003(GMM)
Page -25-

employee. As indicated, no factor is dispositive. However, on these facts, Plaintiff is not an employee of UPR.

This Court can stop here because the record does not support that Plaintiff is a *bona fide* employee of UPR. Accordingly, she has no actionable claim under Title VII. Yet, were the Court to consider Plaintiff a *bona fide* employee of the UPR, it must review the timeliness of her claim.

F.   Title VII Retaliation

A Title VII plaintiff must file an administrative charge with the EEOC within 180 or 300 days after the "alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). Puerto Rico is a deferral jurisdiction. Accordingly, an employee must file the administrative charge within 300 days of the alleged unlawful conduct if she first files a charge with the Commonwealth of Puerto Rico Department of Labor; otherwise, the charge must be filed within 180 days. Frederique-Alexandre v. Dep't of Nat. & Envtl. Res. P.R., 478 F.3d 433, 437 (1st Cir. 2007). On October 3, 2018, Plaintiff filed a charge before both, the Puerto Rico Department of Labor-Antidiscrimination Unit and the EEOC. (Docket No. 71, Exhibit 5). Plaintiff was informed on August 7, 2018, that her teaching services agreement would not be renewed. Upon this alleged retaliatory act, she had 300 days to file her charge before the EEOC and she did so, well within the limitations period—that

is, 57 days after the "alleged unlawful employment practice occurred."

A claimant may establish an actionable claim of retaliation under Title VII with either direct or circumstantial evidence. *See*, e.g., <u>DeCaire v. Mukasey</u>, 530 F.3d 1, 20 (1st Cir. 2008). Absent direct evidence, Title VII retaliation claims proceed under the burden-shifting framework outlined in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 801-03 (1973). To establish a prima facie case of retaliation, the plaintiff must show that: (1) she engaged in protected conduct; (2) she was subjected to an adverse employment action; and (3) the adverse employment action is causally linked to the protected conduct.'" <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 59 (2006); <u>Hernandez v. Wilkinson</u>, 986 F.3d 98 (1st Cir. 2021) (*citing* <u>Rivera-Rivera v. Medina & Medina, Inc.</u>, 898 F.3d 77, 94 (1st Cir. 2018)). "Once the plaintiff makes out this prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions." <u>Planadeball</u>, 793 F.3d at 175. If the defendant is able to do so, the burden then returns to the plaintiff "to show that the defendant's explanation is a pretext for unlawful retaliation." <u>Id.</u>

1.   <u>Protected Conduct</u>

As to the <u>first prong</u>, there is no controversy in that:

Civil No. 20-01003(GMM)
Page -27-

    a.   On <u>March 17, 2016</u>, Plaintiff verbally informed the incident to former Humanities Department Director Hernández. (Docket Nos. 71, Exhibit 1 at 16, and 79 at 8 ¶ 15);

    b.   On <u>April 5, 2016</u>, Plaintiff complained in writing to former Department Director Hernández by means of a letter dated April 4, 2016. (Docket Nos. 71, Exhibit 1 at 22, and 79 at 9 ¶ 20);

    c.   On <u>November 27, 2017</u>, Plaintiff submitted a copy of the April 4, 2016 letter to newly appointed Department Director Mucher. (Docket Nos. 71, Exhibit 1 at 51-52 and Exhibit 4, and 79 at 12 ¶ 31); and

    d.   On <u>December 18, 2017</u>, Plaintiff submitted a sworn statement to HR. (Docket Nos. 71, Exhibit 1 at 55, 72-73, and 79 at 13 ¶ 34).

Therefore, there is no dispute that Plaintiff engaged in protected conduct under Title VII.

    2.   <u>Adverse employment action</u>[5]

Moving to the <u>second prong</u>, the Court examines if Plaintiff was subjected to an adverse employment action. Typically, an adverse employment action involves a discrete change in the terms

---

[5] Plaintiff alleges in her Complaint that:

> Because defendant created a hostile environment, and harassed Professor Cáez in retaliation for her complaints about the hostile environment it was illegal and discriminatory and defendant made the decision to harass and eventually not renew Professor Cáez's contract without just cause, defendant UPR violated Title VII with knowing and reckless disregard of said Act's proscriptions.

Docket No. 1 ¶ 96. Although Plaintiff attempts to bring a retaliatory hostile work environment claim, Plaintiff's allegations are conclusory and insufficient. There is nothing in the record that points, much less shows, that she was subjected to harassment by fellow teachers, or anyone as a matter of fact, as punishment for undertaking protected activity or that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment for that reason. *See* <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 786 (1998); <u>Rivera-Rivera v. Medina & Medina, Inc.</u>, 898 F.3d 77 (1st Cir. 2018); <u>Noviello</u>, 398 F.3d at 89.

and conditions of employment (say, a discharge, demotion, or reduction in pay). *See* Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005). Plaintiff's fixed term teaching services agreement was not renewed for one semester.[6] This, under First Circuit caselaw, can be considered an adverse employment action. *See* Kassaye v. Bryant College, 999 F.2d 603, 607 (1st Cir. 1993) (noting that refusal to renew employment contract may provide grounds for Title VII complaint); Hernandez-Mejias v. Gen. Elec., 428 F.Supp.2d 4, 7-8 (D.P.R. 2005) ("[W]e agree with the overwhelming majority of courts that non-renewal of an employment contract constitutes an adverse employment action.").

3.   Causal Connection

Regarding the third prong, UPR alleges Plaintiff failed to establish a causal connection between the non-renewal of her full-workload teaching services agreement for one semester of the 2018-2019 academic year (adverse employment action) and the protected conduct (sexual harassment complaint). In her own words:

> In December 2017, I formally filed an internal sexual harassment complaint with [HR] against [Lugo]. In August 2018, [UPR] did not renew the contract because of alleged budget cuts. (Docket No. 71, Exhibit 5, and 79 at 14 ¶ 40) (emphasis added)

---

[6] Plaintiff's full workload teaching services agreement was not renewed for the 2018-2019 academic year. UPR, however, offered her a partial workload which she rejected. She later received a full workload teaching services agreement for the 2019-2020 academic year.

According to UPR, almost 17 months elapsed between Plaintiff's complaint on March 17, 2016, and the non-renewal of the teaching services agreement which, indisputably, occurred on August 7, 2018. UPR adds that close to eight months passed between Plaintiff's re-filing and/or formal filing of her complaint before HR on December 18, 2017, and the non-renewal.

Plaintiff disagrees, in part, with UPR. Albeit both Parties settle—UPR, naturally, for argument's sake—in that UPR first retaliated against her when it did not renew her teaching services agreement (August 7, 2018); they disagree on the date when Plaintiff engaged in the protected conduct (sexual harassment complaint).

Regardless, the Court considers the element of proximity in light of Plaintiff's four complaints, including, Plaintiff's proposed timetable before the EEOC and her judicial complaint.

When, as here, there is a lack of direct evidence of a causal link between a plaintiff's protected conduct and subsequent adverse employment action, the Court must look to temporal proximity to satisfy the causal connection element. Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 25 (1st Cir. 2004).

March 17, 2016 (protected conduct) - August 7, 2018 (adverse employment action)

If the Court calculates proximity from the date of the first complaint, when she verbally reported the incident to former

Civil No. 20-01003(GMM)
Page -30-

Humanities Department Director Hernández on March 17, 2016, and the date of the alleged retaliatory act on August 7, 2018, when UPR notified Plaintiff, it would not renew her teaching services agreement for academic year 2018-2019 — **2 years, 4 months, and 21 days elapsed between events.**

April 5, 2016 (protected conduct) - August 7, 2018 (adverse employment action)

If the Court calculates proximity from the date of the second complaint, when she reported in writing the incident to former Humanities Department Director Hernández on April 5, 2016- **2 years, 4 months, 2 days elapsed between events.**

November 27, 2017 (protected conduct) - August 7, 2018 (adverse employment action)

If the Court calculates proximity from the date of the third complaint, when Plaintiff reported in writing the incident to newly appointed Humanities Department Director Mucher on November 27, 2017 - **8 months, 11 days elapsed between events.**

December 18, 2017 ("protected conduct") - August 7, 2018 (adverse employment action)

If the Court calculates proximity from the date of the fourth "complaint" when Plaintiff submitted in writing and under oath a sworn statement required by HR on December 18, 2017 - **4 months, 11 days** transpired.

Plaintiff wants the Court to ignore the fact that she put UPR on notice of the incident with Lugo years before UPR informed her

it would not renew her teaching services agreement <u>for one semester</u>. Plaintiff insists the Court omit uncontested dates in which she engaged in protected activity. The Court cannot disregard: (1) the undisputed fact that UPR first knew of her complaint in 2016; (2) that she alleged at the EEOC that she formally filed her complaint in 2017; and (3) governing legal standards on causal connection to conclude that "August 2018 was the first time after [she] filed her sexual harassment complaint that the UPR had to make decisions about whom to offer classes"[7]. This allegation is blatantly unsupported by the record. Regardless of the date selected to calculate proximity, Plaintiff's retaliation claim equally fails.

First Circuit caselaw establishes that, under certain circumstances, a <u>3 month-gap</u> between the protected activity and the adverse employment action is "close enough to suggest causation." <u>Sánchez-Rodríguez v. AT&T Mobility P.R., Inc.</u>, 673 F.3d 1, 15 (1st Cir. 2012). Yet, binding and most recent First Circuit caselaw simply supports the fact that the time gap here is far too remote—no matter which date considered—for any court to find causal connection based on temporal proximity. *See* <u>López-Hernández v. Terumo Puerto Rico LLC</u>, 64 F.4th 22, 32 (1st Cir. 2023) *citing* <u>Calero-Cerezo</u>, 355 F.3d at 25 ("Three and four month

---

[7] Docket No. 77 at 13.

periods have been held insufficient to establish a causal connection based on temporal proximity."); Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010) (affirming summary judgment in Title VII retaliation case for failure to establish causation because "[w]ithout some corroborating evidence suggestive of causation—and there is none here—a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action"); Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (explaining chronological proximity does not establish causality by itself, especially if "[t]he larger picture undercuts any claim of causation.") (quoting Soileau v. Guilford of Me., Inc., 105 F.3d 12, 16 (1st Cir. 1997)).

The facts before the Court mandate the same conclusion: there is no temporal proximity between the time Plaintiff filed any of her complaints and the time UPR informed her that they would not renew the teaching services agreement for the upcoming semester. Simply put: Plaintiff could not establish prima facie case of retaliation under Title VII.

Considering the uncontested facts, viewing the summary judgment record in the light most favorable to the Plaintiff and giving her the benefit of all reasonable inferences, the Court finds that Plaintiff has not shown that a reasonable jury could conclude that her sexual harassment complaint was the but-for cause of the notice of non-renewal of the teaching services agreement

for one semester (adverse employment action). Her claim ends here as the burden does not shift to the Defendant to articulate a legitimate, non-retaliatory explanation for its actions. Summary judgment is therefore proper on Plaintiff's Title VII retaliation claim.

## V.    CONCLUSION

For the reasons stated above, the UPR's *Motion for Summary Judgment* is GRANTED: Section 1983 claims included in the First and Second Causes of Action; the Puerto Rico law claims included in the Fourth, Fifth and Sixth Causes of Action; and the Title VII retaliation claim are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this July 11, 2023.


                              s/Gina R. Méndez-Miró
                              GINA R. MÉNDEZ-MIRÓ
                              UNITED STATES DISTRICT JUDGE